THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FREDERICK E. HOOD, Defendant-Appellant.

Fourth District   No. 4—03—0178

Opinion filed November 3, 2003.

Donna S. Morrison, of Polinske & Associates, P.C., of Edwardsville, for appellant.

Vince Moreth, State's Attorney, of Carlinville (Norbert J. Goetten, Robert J. Biderman, and James C. Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE TURNER delivered the opinion of the court:

In December 2000, the State charged defendant, Frederick E. Hood, with reckless homicide, aggravated driving under the influence of alcohol, illegal transportation of alcohol, and failure to yield to a pedestrian in the crosswalk, all in connection with a motor vehicle accident that resulted in a pedestrian's death. In May 2002, a jury found defendant guilty on all four counts. In June 2002, defendant filed a posttrial motion, which the trial court denied. In January 2003, the trial court sentenced defendant to three years in prison on the reckless homicide count.

On appeal, defendant argues (1) the trial court erred in allowing certain expert and rebuttal testimony, (2) he was denied a fair trial because of the prosecutor's alleged improper statements during closing arguments, and (3) the State failed to present evidence to sustain defendant's convictions for failure to yield to a pedestrian in a crosswalk and illegal transportation of alcohol. We affirm in part, reverse in part, and remand for a new trial.

# I. BACKGROUND

On December 1, 2000, the State charged defendant by information with the offense of aggravated driving under the influence of alcohol (625 ILCS 5/11—501(d)(1)(C) (West 2000)), alleging that on November 28, 2000, he drove a 1986 Dodge Ram while under the influence of alcohol and was involved in a motor vehicle accident resulting in great bodily harm, permanent disability, or disfigurement to another and the proximate cause of those injuries.

On December 27, 2000, the State charged defendant by information with the offense of reckless homicide (720 ILCS 5/9—3(a) (West 2000)), alleging he, while under the influence of alcohol to a degree that rendered him incapable of safely driving and while acting in a reckless manner, performed acts likely to cause death or great bodily harm to an individual, in that he operated his vehicle, and after disobeying a stop sign, he struck a pedestrian in the crosswalk, causing the death of Marie L. Schwab. The State also charged defendant with the traffic offenses of illegal transportation of alcohol (625 ILCS 5/11—502(a) (West 2002)) and failure to yield to a pedestrian in the crosswalk (625 ILCS 5/11—1002(a) (West 2002)). Defendant pleaded not guilty and requested a jury trial.

In May 2002, defendant's jury trial commenced. David Smith testified he was driving with his girlfriend to pick up his son from school on November 28, 2000. He testified the intersection of Main and Poplar in Mount Olive is a four-way stop. As he was stopped at the stop sign, he noticed a brown, full-size van approaching the intersection "at a pretty good rate of speed." After the van's driver "made the corner," Smith saw a woman "about halfway through the crosswalk." She held her left hand up as to motion to the van's driver to stop, but the van struck the woman as she was "in the crosswalk." Smith observed the woman "go through the air and land on the pavement," and he proceeded to a nearby police station to summon help. On his way, he noticed the van's driver, identified as defendant, step out of the van "and kind of stumble and lean against the door."

Tricia Marietta, Smith's girlfriend at the time of the incident, testified the weather was overcast on November 28, 2000. She stated Smith had stopped at the intersection when she saw a vehicle that was not "slowing down" and hit the woman who was walking.

Ryan Gorman, a deputy with the Macoupin County sheriff's department, testified he responded to the scene of the accident on November 28, 2000. Gorman observed defendant leaning up against the side of his van holding a child. Upon conversing with defendant, Gorman noticed his eyes were "bloodshot and glossy," and his breath had a "strong odor of alcoholic beverage." Further, Gorman found

defendant's "speech was mumbled together." Gorman stated defendant told him he was coming from a tavern in Mount Olive when he hit the victim. After defendant was arrested, Gorman conducted an inventory search of his van and found "a cooler that contained beer cans in it, some full, some empty." Gorman stated the beer was cold, and the cooler contained several open and full cans of beer. Upon leaving an officer's squad car to enter the hospital for a blood and urine draw, defendant "was staggering and uneasy as he walked." Based on his experience, Gorman believed defendant was intoxicated. From the time of the accident to defendant's urine test, Gorman stated he appeared "to be sobering up some."

Dr. Travis Hindman, a forensic pathologist, testified he performed an autopsy on Marie Schwab on December 19, 2000. Defense counsel stipulated to his credentials, and the trial court recognized him as an expert. Based on his expert opinion, Dr. Hindman found the cause of death to be brain trauma due to the injuries sustained in a pedestrian-vehicular collision. Dr. Hindman stated he has testified as a witness in the area of how the body metabolizes alcohol after it has been ingested. Defense counsel objected to Dr. Hindman testifying to any examination of blood samples as he was only disclosed as performing the autopsy. The trial court sustained the objection.

John Tandy, a patrolman with the Mount Olive police department at the time of the accident, testified that upon asking defendant what happened, he told the officer he stopped at the stop sign, turned left, heard a "thump or a thud," and stopped. Tandy noticed a strong odor of beer from defendant's breath, and his eyes were "glassy and bloodshot." Defendant leaned up against the door of the van "the whole time." Tandy asked defendant if he would be willing to undergo several field-sobriety tests, including the one-legged stand, the nystagmus test, and the turn-and-walk test, but he refused. Defendant told Tandy he had two beers at a local tavern. Tandy also testified to the cooler of beer found in defendant's van. He recalled seven unopened cans and five empty cans, with one open can partially full of a substance that smelled like beer. Tandy transported defendant to the hospital and described him as "uneasy on his feet," "stumbling," and "staggering a little bit." Tandy stated they waited an hour to an hour and a half before defendant's blood and urine were collected. During that time, defendant stood leaning up against the wall, but he "sobered up quite a bit."

The parties stipulated that defendant's blood test indicated a blood-alcohol content of 0.077. The trial court denied defendant's motion for directed verdict.

The defense called Bob Bonacorsi as its first witness. He testified

he was driving west through Mount Olive on the date of the incident. He stated the sun was "so bad" that he had to roll down his window to look out "because [he] couldn't see anything." Bonacorsi testified this occurred in close proximity to the accident scene.

Danielle Shelton testified she saw defendant on the day of the accident between 1:30 p.m. and 2 p.m. as she was bartending at JC's Tavern. Defendant came in the tavern with "his little boy," stayed for 45 minutes, and had one beer. Shelton stated defendant did not appear to be under the influence of alcohol when he came in or when he left.

Mary Joanne Cartwright, owner of JC's Tavern, testified defendant came in the tavern on the date of the accident with his infant son. He did not appear to be under the influence of alcohol to her. She stated he had one beer.

Denise Vojas, a part-time employee at Tillie's Tavern in Mount Olive, testified defendant entered the bar on the date of the accident at around 1:30 p.m. While in the bar, defendant "had a bottle of Busch," ordered another, "drank half of it," and left after 25 to 30 minutes. According to Vojas, defendant did not appear to be under the influence of alcohol before or after he left.

Hervana Hood, defendant's mother, testified she was called to the scene of the accident to pick up defendant's son. She saw defendant standing "straight" at the side of his van holding his son. She stated defendant "was really upset." He did not appear to have trouble standing and was not slurring his words.

Defendant testified he kept a cooler in his van because he lived in a dry county in Arkansas. He stated the cooler contained some full and empty cans, was behind the driver's seat, and had been there for "a couple of days." Defendant testified he had three knee surgeries. He stated he arrived in Mount Olive from Arkansas at "about 1:30, 2 o'clock." He stopped at JC's Tavern to find "hired guns" to help him move some property. He had one beer and stayed for about 30 minutes. He left and went to Tillie's and "ordered a beer so [he] wouldn't seem rude." He also drank part of a second beer.

Defendant testified he approached the intersection at Poplar and Main in Mount Olive, and his son threw his bottle causing defendant to look back at him after stopping at a stop sign. Defendant then started to make a turn, but the "sun was in [his] eyes" and he "heard a thunk and immediately stopped." He did not see Schwab "in the crossroad." He exited his vehicle, yelled for help, and then attempted to comfort his crying son. Officer Tandy later told him he was under arrest for drunk driving, and defendant asked to take a field-sobriety test, but Tandy refused. Officer Tandy later took him back to Mount Olive, where defendant went to JC's Tavern to have a soda and find a ride home.

On cross-examination, defendant stated the cooler still had ice in it because he "put a blanket over it." The empty beer cans were in the cooler because he did not want to litter and his 13-year-old son recycles the cans. He testified he never refused to take any breath or blood tests.

Following defendant's testimony, defense counsel made a motion *in limine* to exclude any rebuttal testimony from Dr. Hindman concerning blood-alcohol content. The trial court denied the motion.

The State called Dr. Hindman in rebuttal. The trial court found Dr. Hindman to be qualified as an expert toxicologist. Then, the State recalled Officer Tandy, who testified defendant was 5 feet 7 inches tall and weighed 160 pounds on November 28, 2000, based on his driver's license information. The State recalled Dr. Hindman to testify to a hypothetical as to his opinion on the blood-alcohol level for an individual, 5 feet 7 inches tall, 160 pounds, having 2.5 to 2.75 12-ounce beers at around 2:30 p.m. and blood tested at 5:40 p.m. Dr. Hindman opined the blood-alcohol level of that individual at that time would be 0.0255. If a hypothetical person had a 0.077 blood-alcohol level at 5:40 p.m., based on the rate of reduction, the person's level at 3 p.m. would have been 0.114.

Officer Gorman testified in rebuttal that defendant refused to submit to any field-sobriety tests. Following closing arguments, the jury found defendant guilty of reckless homicide based upon driving under the influence of alcohol, aggravated driving under the influence of alcohol involving a personal injury motor vehicle accident, illegal transportation of alcohol in a motor vehicle, and failure to yield to a pedestrian in a crosswalk.

In June 2002, defendant filed a posttrial motion, arguing, *inter alia*, the trial court erred in allowing Dr. Hindman to testify as a rebuttal witness. In November 2002, the trial court denied the motion. In January 2003, the trial court sentenced defendant to three years in prison on the reckless homicide count. The court found the offense of aggravated driving under the influence was a lesser-included offense of reckless homicide and vacated the jury verdict on the former offense. This appeal followed.

## II. ANALYSIS

### A. Dr. Hindman's Testimony

Defendant argues the trial court erred in allowing Dr. Hindman to testify to reverse extrapolation in his rebuttal testimony. We agree.

In its February 2001 answer to discovery, the State listed Dr. Hindman as the Sangamon County coroner and as a possible witness, along with attaching the forensic report. During defendant's jury trial,

defense counsel objected to Dr. Hindman's proposed testimony regarding reverse extrapolation of alcohol since he was disclosed as the one who conducted the autopsy of the victim. The trial court sustained the objection, finding the State could not elicit testimony from Dr. Hindman concerning reverse extrapolation in its case in chief because it failed to apprise defense counsel of the proposed testimony in pretrial discovery. After defendant testified, the State noted its intention to call Dr. Hindman as a rebuttal witness. Defense counsel made a motion *in limine* to exclude Dr. Hindman's rebuttal testimony, which the trial court denied. In rebuttal, the trial court found Dr. Hindman qualified as an expert in toxicology.

Defendant's argument on appeal centers on whether (1) Dr. Hindman had the qualifications to testify to reverse extrapolation, (2) the State's failure to disclose Dr. Hindman as an expert in reverse extrapolation was error, (3) Dr. Hindman's testimony lacked a proper foundation, and (4) the trial court erred in allowing Dr. Hindman's rebuttal testimony.

## 1. *Expert Qualifications*

■ Defendant argues the State failed to establish Dr. Hindman as an expert on reverse extrapolation. We find defendant has forfeited this argument on appeal.

"To sustain an argument for appeal, both an objection at trial and a written posttrial motion raising the objection are required." *People v. Reynolds*, 302 Ill. App. 3d 722, 730, 706 N.E.2d 49, 55 (1999), citing *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988). Here, defendant failed to raise the issue of Dr. Hindman's qualifications in his posttrial motion, and defense counsel did not argue this issue at the posttrial hearing. Thus, defendant has forfeited this argument on appeal.

## 2. *Failure To Disclose*

Defendant argues the State failed to disclose Dr. Hindman as an expert in reverse extrapolation of alcohol, causing him prejudice. We agree.

■ "[T]he purpose of the discovery rules is to protect the accused against surprise, unfairness, and inadequate preparation." *People v. Heard*, 187 Ill. 2d 36, 63, 718 N.E.2d 58, 73 (1999). Although compliance with discovery rules is mandatory, the State's failure to comply with discovery rules does not require reversal of a defendant's conviction absent a showing of surprise or unfair prejudice. *People v. Robinson*, 157 Ill. 2d 68, 78, 623 N.E.2d 352, 357 (1993). The defendant has the burden of showing surprise or prejudice. *Heard*, 187 Ill. 2d at 63, 718 N.E.2d at 74.

■ Supreme Court Rule 412(a)(i) (188 Ill. 2d R. 412(a)(i)) requires the State, as part of pretrial discovery and upon the defendant's request, to supply the defendant with the names of persons whom the State intends to call as witnesses. Supreme Court Rule 412(a)(iv) (188 Ill. 2d R. 412(a)(iv)) requires the State to disclose "any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons, and a statement of qualifications of the expert."

In this case, the State listed Dr. Hindman as a possible witness in its pretrial discovery and attached the forensic report. Defense counsel could thus reasonably conclude Dr. Hindman would testify to the autopsy he performed on the victim. With nothing else, defense counsel could not reasonably conclude prior to trial that Dr. Hindman would offer his expertise on reverse extrapolation of alcohol. Had defense counsel been aware of such testimony, he could have attempted to call his own experts to refute Dr. Hindman's conclusions.

We recognize discovery in civil cases is conducted much differently than discovery in criminal cases. For example, Supreme Court Rule 213 (177 Ill. 2d R. 213(g)), governing civil cases, requires the parties to identify the subject on which the expert witnesses will testify as well as the opinions the experts will offer. This requirement is noticeably lacking in Rule 412. Nonetheless, we note that Rule 412(a)(iv) requires the State to provide statements of experts regarding "scientific tests, experiments, or comparisons" made by the experts. 188 Ill. 2d R. 412(a)(iv). Here, the doctor used extrapolation to compare a hypothetical person's blood-alcohol concentration to the extrapolated blood-alcohol concentration of defendant if defendant had consumed $2^3/_4$ beers as he testified. Thus, the State arguably failed to disclose comparisons made by its expert under Rule 412(a)(iv). Moreover, even if the calculations of the doctor were not technically comparisons under the rule, it seems clear his calculations regarding reverse extrapolation should have been disclosed to defendant under the spirit of the rule. Finally, although these calculations were apparently not reduced to writing prior to the doctor's testimony, we believe the State was aware of the calculations before questions were posed to the doctor.

As noted in *People v. Sims*, 244 Ill. App. 3d 966, 612 N.E.2d 1011 (1993), "[t]here are numerous criminal cases whereby experts were allowed to testify even when their existence was not fully disclosed or the gist of their testimony was not fully revealed to defense counsel." *Sims*, 244 Ill. App. 3d at 993, 612 N.E.2d at 1032-33, citing *People v. Carr*, 188 Ill. App. 3d 458, 544 N.E.2d 978 (1989); *People v. Fleming*,

155 Ill. App. 3d 29, 507 N.E.2d 954 (1987); *People v. Scheidt*, 142 Ill. App. 3d 844, 492 N.E.2d 248 (1986); *People v. Jackson*, 131 Ill. App. 3d 128, 474 N.E.2d 466 (1985); *People v. Taylor*, 107 Ill. App. 3d 1019, 438 N.E.2d 565 (1982); *People v. Davis*, 105 Ill. App. 3d 129, 434 N.E.2d 13 (1982). Although several of these cases questioned whether any discovery violation had occurred, none based its decision on that issue alone. Instead, all of the courts ultimately hinged their decisions on whether the defendant had been unfairly surprised and prejudiced.

Here, the State indicated it did not know Dr. Hindman was qualified to testify to reverse extrapolation until the afternoon of the trial's first day. The trial court noted that if it was a surprise to the State, it was "a bigger surprise to the defendant." Moreover, the State had evidence in the toxicology reports that defendant's blood-alcohol level was 0.077 at 5:40 p.m. The State should have foreseen expert testimony would be needed if it desired to present evidence of defendant's blood-alcohol level at the time of the accident. This should have been presented in the State's case in chief, but as stated, the trial court prohibited the State's belated attempt to present the evidence because of prejudice to defendant due to lack of notice. However, admitting the doctor's testimony as rebuttal evidence did not lessen the prejudice to defendant, and we are not persuaded this prejudice may be ignored merely because the evidence was used as "rebuttal."

■ "The duty to disclose rebuttal witnesses, as with all witnesses, arises when the State has formed the intent to call such a witness." *People v. Bock*, 242 Ill. App. 3d 1056, 1067, 611 N.E.2d 1173, 1181 (1993).

> "The law regarding disclosure of rebuttal witnesses in criminal cases is well settled. Until the prosecutor forms the intent to call the witness, disclosure is not required. [Citation.] This court has held that '[b]ecause the State may not know if a witness will be called in rebuttal until the defense testimony is heard, the State need not inform the defense of its intention to call a rebuttal witness until that intention is formed.' [Citation.] When the State fails to make timely disclosure of a rebuttal witness, the trial court is not required to exclude the rebuttal witness' testimony. (*People v. Bock* (1993), 242 Ill. App. 3d 1056, 1068, 611 N.E.2d 1173[, 1181].) In *Bock*, defendant objected to the State's decision to call a rebuttal witness who was identified on the morning of the trial. Defendant alleged that, because the witness was disclosed on the day of the trial, he had not had an opportunity to do any investigation. However, defendant did not request a continuance and the court allowed the witness to testify. On appeal, the appellate court held that the defendant was not prejudiced by the testimony of the rebuttal witness. (*Bock*, 242 Ill. App. 3d at 1069[, 611 N.E.2d at

1182].) The court reasoned that defendant had an opportunity to interview the rebuttal witness, failed to request a continuance to conduct further investigation and cross-examined the witness during trial." *People v. Weber*, 264 Ill. App. 3d 310, 315-16, 636 N.E.2d 902, 906 (1994).

■ Here, after the trial court excluded Dr. Hindman's testimony in the State's case in chief, the State could then have indicated its intention to call him on rebuttal if defendant decided to testify. Instead of informing defendant then, the State waited until after defendant testified and then sought to offer Dr. Hindman's testimony on rebuttal. While we agree the State cannot know with certainty the substance of a given defendant's testimony, here, we note the State in its case in chief had already elicited Tandy's testimony that defendant claimed he had consumed only two beers.

More troublesome is the nature of this "rebuttal" testimony. The testimony was not presented to counter a defense witness's testimony on defendant's blood-alcohol concentration. Instead, the State argues the testimony was offered to rebut defendant's testimony that he had consumed $2^3/4$ beers. However, the doctor's evidence went beyond rebutting defendant's claim and beyond rebutting the testimony of defendant's lay witnesses, who opined defendant was not under the influence of alcohol. The doctor's testimony allowed the State to request and be given the third paragraph of Illinois Pattern Jury Instructions, Criminal, No. 23.30, which instructs the jury in pertinent part that "[i]f you find beyond a reasonable doubt that at the time the defendant drove a vehicle that the amount of alcohol concentration in the defendant's blood or breath was 0.08 or more, you may presume that the defendant was under the influence of alcohol." Illinois Pattern Jury Instructions, Criminal, No. 23.30 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 23.30)). Thus, the doctor's testimony, if believed, did more than simply rebut defendant's evidence. It introduced into the case a presumption against defendant and in favor of the State.

The trial court abuses its discretion when it fails to eliminate the prejudice against defendant by a discovery violation. *People v. Hood*, 229 Ill. App. 3d 202, 216, 593 N.E.2d 805, 815 (1992). Because of the prejudice to defendant here and given the unique circumstances of this case, we find the trial court abused its discretion in allowing Dr. Hindman's testimony on rebuttal. Accordingly, defendant's conviction for reckless homicide must be reversed and a new trial ordered. Because of our decision to reverse defendant's reckless homicide conviction, we need not address his remaining issues on Dr. Hindman's rebuttal testimony and the State's closing arguments.

## B. Guilt Beyond a Reasonable Doubt

Defendant argues the State's evidence was insufficient to sustain

the convictions for failure to yield to a pedestrian in a crosswalk and for illegal transportation of alcohol. We disagree.

■ When reviewing a challenge to the sufficiency of the evidence, in a criminal case, the relevant inquiry is whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Pollock*, 202 Ill. 2d 189, 217, 780 N.E.2d 669, 685 (2002). The trier of fact has the responsibility to determine the credibility of witnesses and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from that evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259, 752 N.E.2d 410, 425 (2001). A court of review will not overturn the verdict of the fact finder "unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt." *People v. Maggette*, 195 Ill. 2d 336, 353, 747 N.E.2d 339, 349 (2001).

### 1. *Failure To Yield to a Pedestrian in a Crosswalk*

■ Section 11—1002(a) of the Illinois Vehicle Code provides as follows:

> "When traffic control signals are not in place or not in operation the driver of a vehicle shall yield the right-of-way, slowing down or stopping if need be to so yield, to a pedestrian crossing the roadway within a crosswalk when the pedestrian is upon the half of the roadway upon which the vehicle is traveling, or when the pedestrian is approaching so closely from the opposite half of the roadway as to be in danger." 625 ILCS 5/11—1002(a) (West 2002).

■ At trial, David Smith testified he witnessed defendant's van strike Schwab while she was in the crosswalk. He stated defendant's van approached the intersection "at a pretty good rate of speed," and the pedestrian in the crosswalk held her hand up as if to motion for the driver to stop his vehicle. The testimony presented clearly indicated it was defendant's van that struck Schwab. Smith stated the impact threw Schwab "about five feet," and defendant's van was not in the intersection when it came to a stop. Based on the testimony and evidence presented, a reasonable jury could find Schwab was in the crosswalk when she was struck by defendant's van.

### 2. *Illegal Transportation of Alcohol*

■ Section 11—502(a) of the Illinois Vehicle Code provides, in part, as follows:

> "[N]o driver may transport, carry, possess[,] or have any alcoholic liquor within the passenger area of any motor vehicle upon a highway in this State except in the original container and with the seal unbroken." 625 ILCS 5/11—502(a) (West 2002).

■ At trial, Deputy Gorman testified he found a cooler in defendant's van containing full and empty beer cans. Tandy also testified to the cooler containing unopened and empty beer cans, along with one can partially full of a substance that smelled like beer. He stated one can of Busch beer was standing upright in the cooler and was partially full. He had occasion in the past to smell beer, and he stated the remaining liquid in the can "smelled like beer." The State's failure to introduce testimony concerning a chemical analysis of the liquid in the beer cans does not preclude a finding of guilt. *People v. Angell*, 184 Ill. App. 3d 712, 717, 540 N.E.2d 1106, 1109 (1989). Defendant does not argue Tandy was not competent to testify to his observations and opinion that the partially full can in the cooler contained beer at the time of the accident. Defendant admitted having full and empty beer cans in the cooler, but denied one can was partially full. The jury had the responsibility to resolve these conflicts in the evidence, and sufficient evidence was presented to establish defendant's guilt beyond a reasonable doubt.

### III. CONCLUSION

For the reasons stated, we affirm in part, reverse in part, and remand for a new trial. As we are remanding this cause for a new trial, we find the record contains sufficient evidence for the jury to have found defendant guilty of reckless homicide and aggravated driving under the influence of alcohol beyond a reasonable doubt. Thus, no double jeopardy violation will occur upon retrial. *In re R.A.B.*, 197 Ill. 2d 358, 369, 757 N.E.2d 887, 894 (2001). This conclusion does not imply a determination of defendant's guilt or innocence that would be binding on retrial. *R.A.B.*, 197 Ill. 2d at 369, 757 N.E.2d at 894.

Affirmed in part, reversed in part, and remanded for a new trial.

KNECHT, J., concurs.

JUSTICE COOK, dissenting:

I respectfully dissent and would affirm the decision of the trial court. I disagree with the trial court's exclusion of Dr. Hindman's testimony regarding blood-alcohol levels during the State's case in chief, but I agree with the court that the testimony should at least have been admitted during rebuttal.

The evidence indicated defendant was drinking between 1:30 and 2 p.m. on the day of the accident. The accident occurred shortly before 3 p.m. Defendant's blood-alcohol level was 0.077 at 5:40 p.m. Dr. Hindman testified that defendant's blood-alcohol level at the time of the ac-

cident was probably 0.114. It is common knowledge that immediately after the consumption of alcohol, the body goes through a period of absorption, or rising blood-alcohol level, and then through a process of elimination, or falling blood-alcohol level. *People v. Beck*, 295 Ill. App. 3d 1050, 1062, 693 N.E.2d 897, 905 (1998) (only natural for blood-alcohol level to diminish after several hours). Experts in other cases have testified that alcohol is eliminated from the body at an average rate of 0.015 to 0.02 per hour in 85% of males. See *People v. Latto*, 304 Ill. App. 3d 791, 797, 710 N.E.2d 72, 77 (1999). Defendant's blood-alcohol level at 5:40 p.m. was only 0.003 less than 0.08.

The basic rule of discovery in criminal cases is that the State, upon written motion, is required to disclose the names and addresses of witnesses. 188 Ill. 2d R. 412(a)(i). The State is not required to set out what the witnesses will testify to, although the State is required to disclose any written or recorded statements, or "substantially verbatim reports" of oral statements, which of course may be used for impeachment. 188 Ill. 2d R. 412(a)(i); *cf.* 188 Ill. 2d R. 412(a)(ii) (where the statement is made by *the accused*, the prosecution must disclose "the substance of any oral statement"). Absent a showing of an intentional tactic to prevent disclosure, there is no requirement that oral statements in the State's possession or control be reduced to writing. *People v. Lasley*, 158 Ill. App. 3d 614, 634, 511 N.E.2d 661, 676 (1987); *People v. Williams*, 262 Ill. App. 3d 808, 823-24, 635 N.E.2d 653, 664 (1994). The question before the court is whether the existing notes in the State's file constitute "substantially verbatim reports," not whether defense counsel would be surprised or whether it would be a good idea for the State to prepare a more thorough report. 188 Ill. 2d R. 412(a)(i). Defense counsel may avoid surprise by interviewing the witnesses who have been disclosed. *Lasley*, 158 Ill. App. 3d at 634-35, 511 N.E.2d at 675-76.

Rule 412 requires little more in the case of experts, only the disclosure of their "reports or statements," including results of examinations or tests, and disclosure of the expert's qualifications. 188 Ill. 2d R. 412(a)(iv). "Statements" apparently means formal statements similar to reports, or examination and test results, and not everything that is said by an expert prior to his testifying. "Rule 412 does not require that every conversation with witnesses during the course of investigation be reduced to writing." *People v. Davis*, 105 Ill. App. 3d 129, 132, 434 N.E.2d 13, 15 (1982) (doctor and nurse allowed to testify in reckless homicide case despite argument that listing of names was insufficient to put defendant on notice they would be asked their opinion on issue of intoxication).

The majority argues that the prosecution confused the defense

when it attached Dr. Hindman's autopsy report indicating the cause of death and did not alert defense counsel to Dr. Hindman's expertise in reverse extrapolation. "Had defense counsel been aware of such testimony, he could have attempted to call his own experts to refute Dr. Hindman's conclusions." 343 Ill. App. 3d at 1253. Really? Defense counsel could not anticipate the argument that a blood-alcohol level of 0.077 at 5:40 p.m. might indicate a blood-alcohol level of more than 0.08 three hours earlier? In the unlikely event any expert would ever dispute that defendant earlier had a blood-alcohol level greater than 0.077, defense counsel surely would have called him, whether Dr. Hindman testified or not.

As the majority points out, civil discovery rules require the parties to identify the subject on which the expert witness will testify and the opinions the expert will offer. 177 Ill. 2d R. 213(g). It is a mistake to introduce the complexities of civil discovery rules into criminal cases. See *Weber*, 264 Ill. App. 3d at 316, 636 N.E.2d at 906 ("defendant's reliance on Supreme Court Rule 220 is misplaced"). The majority's argument that the doctor's testimony, the doctor's calculations, should have been disclosed "under the spirit of the rule" (343 Ill. App. 3d at 1253) is not persuasive. The best indicator of what was intended by Rule 412 is its language, and that language does not require disclosure of the substance of an expert's testimony.

The fact that the State was aware of what Hindman would testify to before questions were posed to him is irrelevant. Even with respect to exculpatory or mitigating information (where the State has a special obligation), the duty to disclose "must be viewed in light of the information available to the State *when the material is disclosed.*" (Emphasis added.) 188 Ill. 2d R. 412, Committee Comments, at lxviii. The duty to disclose is not "subject to continuous updating." 188 Ill. 2d R. 412, Committee Comments, at lxviii.

As the majority points out, because the State may not know if a witness will be called in rebuttal until the defense testimony is heard, the State need not inform the defense of its intention to call a rebuttal witness until that intention is formed. 343 Ill. App. 3d at 1254. That is true even if the State knows who the potential rebuttal witness is and even if the witness has given a written statement. The State need only disclose "persons whom the State intends to call as witnesses." 188 Ill. 2d R. 412(a)(i). The State may have been satisfied with its case in chief, including Officer Tandy's testimony that defendant at the scene had said he had only two beers, until defendant took the stand and repeated that testimony under oath. At that point the State could properly have concluded that defendant was lying, and it needed something more to refute that lie. The State was not required to

anticipate that defendant would perjure himself. I also reject the majority's argument that Dr. Hindman's testimony did not rebut defendant's testimony that he had consumed fewer than three beers. Finally, I suggest that IPI Criminal 4th No. 23.30 could have been given even without Dr. Hindman's testimony. A reasonable jury could conclude that a defendant who has a blood-alcohol level of 0.077 at 5:40 p.m. had a blood-alcohol level greater than 0.08 before 3 p.m. A jury may rely on its common experiences in life, including the fact that the effects of alcohol consumption diminish over a period of hours.